**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**Charles Williams**                                    :
3907 Northampton Road                        :
Cleveland Heights, Ohio 44121             :
                                                                 :
      Plaintiff,                             :          Case No. 1:23-CV-69
                                                                 :
      v.                                         :          **COMPLAINT**
                                                                 :          **(Jury Demand Endorsed Hereon)**
**The Cleveland Clinic Foundation**        :
d/b/a The Cleveland Clinic Health System   :
*Agent for Service of Process*                :
CT Corporation System                          :
4400 Easton Commons Way, Suite 125    :
Columbus, Ohio 43219                          :
                                                                 :
      and                                       :
                                                                 :
**Cleveland Clinic Rehabilitation Hospitals, LLC**   :
*Agent for Service of Process*                :
CT Corporation System                          :
4400 Easton Commons Way, Suite 125    :
Columbus, Ohio 43219                          :
                                                                 :
      and                                       :
                                                                 :
**Select Medical Corporation**               :
3020 Science Park Drive                        :
Beachwood, Ohio 44122                        :
                                                                 :
      and                                       :
                                                                 :
**Midwest Medical Transport Company, LLC**   :
*Agent for Service of Process*                :
Registered Agent Solutions, Inc.              :
4568 Mayfield Road, Suite 204               :
Cleveland, Ohio 44121                         :
                                                                 :
      And                                       :
                                                                 :
**Unknown Medical Transport**             :
                                                                 :
      Defendants.                          :

1

## NATURE OF THE ACTION

1.  This is a civil rights action brought for violations of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Chapter 4112 of the Ohio Revised Code. Plaintiff Charles Williams ("Plaintiff") is profoundly deaf, and he relies on Defendant CCF Cleveland Clinic Foundation, d/b/a The Cleveland Clinic Health System ("Defendant CCF"), for medical treatment and care. Because Plaintiff is profoundly deaf, he receives a lower tier of medical care from Defendant CCF. Despite its status as a major health care system, and numerous requests from Plaintiff, Defendant CCF has repeatedly failed to provide Plaintiff with legally required American Sign Language interpretation services during his medical care. By not providing these services, Defendant CCF exposed, and continues to expose, Plaintiff to the inability to understand and make educated decisions regarding his own medical care in addition to the fear and anxiety of facing a disparate risk of medical mistreatment.

2.  Plaintiff brings this action to compel Defendants to cease their unlawful discriminatory practices by implementing policies and procedures that will ensure him effective communication, full and equal enjoyment of Defendants' medical services, and a meaningful opportunity to participate in and benefit from those services.

## PARTIES

3.  Plaintiff has been, is and will be a patient of Defendants. Plaintiff resides in Cleveland Heights, Ohio within the Northern District of Ohio, Eastern Division.

4.  Defendant CCF is an Ohio nonprofit corporation that provides medical and hospital care primarily in northeast Ohio. Defendant CCF operates its main facility located at 9500 Euclid Avenue, Cleveland, Ohio 44195. Defendant CCF also operates Hillcrest Hospital

located at 6780 Mayfield Road, Mayfield Heights, Ohio 44124. Defendant CCF also operates Euclid Hospital located at 18901 Lakeshore Boulevard, Euclid, Ohio 44119.

5.  Defendant Cleveland Clinic Rehabilitation Hospitals, LLC ("Defendant Rehabilitation Hospitals") operates inpatient rehabilitation facilities, including a facility located at 3025 Science Park Drive, Beachwood, Ohio 44122. Defendant Rehabilitation Hospitals owns fifty-one percent (49%) of the Beachwood facility.

6.  Defendant Select Medical Corporation ("Defendant Select") provides post-acute care hospitals, including a facility located at 3025 Science Park Drive, Beachwood, Ohio 44122. Defendant Select owns forty-nine percent (51%) of the Beachwood facility.

7.  Defendant Midwest Medical Transport Company, LLC ("Defendant MMT") offers ambulance transportation services throughout the Midwest, including the Cleveland area.

8.  Defendant Unknown Medical Transport ("Unknown Defendant") offers ambulance transportation services throughout the Cleveland area.

## JURISDICTION AND VENUE

9.  This Court has subject matter jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1331 because the claims are set forth pursuant to the laws of the United States of America.

10.  The Court has supplemental jurisdiction over Count III, Plaintiff's state law claim, pursuant to 28 U.S.C. § 1367, because the claim arises out of the same set of operative facts.

11.  Venue is proper pursuant to 28 U.S.C. § 1391 as the events giving rise to the causes of action occurred in Cuyahoga County, Ohio, within the Northern District of Ohio, Eastern Division.

## FACTS COMMON TO ALL COUNTS

12.  Plaintiff is profoundly deaf.

13. Plaintiff has been deaf since the late 1960's. Plaintiff became hard of hearing around 1943, when he was twelve (12) years old. By 1969, audiologists confirmed that Plaintiff could no longer hear or understand spoken word.

14. Plaintiff communicates by American Sign Language ("ASL"), which is his first language. ASL is a separate language from English with its own syntax, sentence structure, and grammatical system. Plaintiff has advised Defendant CCF's employees and representatives many times that ASL is his needed and most effective means of communication.

15. Because of the educational barriers that deaf people confronted when he was younger, Plaintiff could not pursue a legal career as he had aspired to do.

16. For 35 years, Plaintiff worked for the Cuyahoga County Engineer's Office.

17. Patricia Cangelosi-Williams, Plaintiff's wife, works as a certified professional ASL interpreter.

18. Though Ms. Cangelosi-Williams works as an interpreter, Defendant CCF cannot legally require her to interpret at Plaintiff's medical appointments.[1] Nor would it be medically advisable to have Ms. Cangelosi-Williams interpret. Family members are too personally and emotionally involved to act impartially, which is a necessity for qualified ASL interpreters in medical settings.

19. Plaintiff has advocated for the black, deaf community. Plaintiff cofounded the National Black Deaf Advocates, a nonprofit advocacy organization, and remains active in the organization.

---

[1] See 28 C.F.R. § 36.303(c)(2) ("A public accommodation shall not require an individual with a disability to bring another individual to interpret for him or her."; see, also, 28 C.F.R. § 36.303(c)(3) (generally barring public accommodations from relying on someone who accompanied the individual with a disability to interpret).

20. In 1977, Plaintiff served as an Ohio delegate to the White House Conference on Handicapped Individuals.

21. When Plaintiff sat on a jury in 1987, he became the first deaf juror in Ohio history. He also has served as the foreperson of a jury.

22. Plaintiff has served as the Vice President of the National Association of Deaf Senior Citizens.

23. Plaintiff chaired and led the development of the Cuyahoga County Community Mental Health Board's Advisory Committee regarding deaf persons.

24. In 2008, Gallaudet University awarded Plaintiff an honorary doctorate. Before then, he had served thirteen (13) years as a member of the Gallaudet University Board of Trustees. Gallaudet University is the world leader in higher liberal education and career development for deaf and hard-of-hearing students. Gallaudet University conducts research on the history, language, culture, and other topics related to the deaf community.

25. Since retiring from the Cuyahoga County Engineer's Office, Plaintiff has taught ASL at Baldwin Wallace University and Cleveland State University.

26. Plaintiff chaired the grant-writing committee that later established Cleveland State University's interpreter-training program.

27. On or about November 30, 2021, Plaintiff had appointments for Radiology and Podiatry, both of which were located at Defendant CCF's main hospital located at 9500 Euclid Avenue, Cleveland, Ohio 44195. Interpreters were requested and confirmed prior to both appointments.

28. At the Radiology appointment, the interpreter did not show up as scheduled. The front desk confirmed that the interpreter was requested and was on the schedule. Ms. Cangelosi-

Williams asked the front desk to call Global Patient Services to determine why no interpreter showed up. Ms. Cangelosi-Williams interpreted for Plaintiff.

29.     At the Podiatry appointment, no interpreter showed up. The nurses brought in the VRI unit and attempted to set up the equipment, but were unsure how to use it. At that point, Plaintiff verbally and vehemently indicated that he not want to use the VRI; he requested an in-person interpreter. The staff responded, "Well, due to COVID, we are limiting interpreters from coming to the hospital." Ms. Cangelosi-Williams interpreted for Plaintiff.

30.     Plaintiff's age-related macular degeneration does not make VRI a viable option.

31.     On December 2, 2021, Plaintiff had to delay a vascular appointment due to lack of an interpreter, causing a two-week delay in care. VRI was offered but Ms. Cangelosi-Williams explained that VRI was not a viable option due to Plaintiff's age-related macular degeneration.

32.     On or about December 8, 2021, Ms. Cangelosi-Williams spoke with Tara LNU in the Ombudsman Office concerning the delay in care for Plaintiff's vascular appointment. Tara LNU was apologetic and appreciated Ms. Cangelosi-Williams' feedback, but she explained that an in-person interpreter is not available with less than forty-eight (48) hours' notice. VRI was offered but Ms. Cangelosi-Williams explained that VRI was not a viable option due to Plaintiff's age-related macular degeneration.

33.     On or about December 10, 2021, Plaintiff had an appointment at Hillcrest Hospital. Plaintiff was told to arrive thirty (30) minutes early to complete paperwork, but the interpreter was not told to arrive early. The interpreter arrived at the scheduled appointment time. Reception desk staff indicated that they have told Global Patient Services to read to the bottom of the page when requesting interpreter, which states the interpreter should

arrive before the patient is scheduled to assist in filling out questionnaires or other paperwork prior to seeing the doctor in the room. Once the interpreter appeared, the interpreter reported the problem to Hannah LNU, the Global Patient Services Manager.

34.    On or about December 28, 2021, Plaintiff had an appointment with Podiatry. The podiatrist sent Plaintiff to Hillcrest emergency department for immediate treatment of a serious foot infection. An interpreter was available for the appointment at Podiatry, and the interpreter followed Plaintiff to the Hillcrest emergency department.

35.    Plaintiff was hospitalized at Hillcrest from December 28, 2021 through January 1, 2022. There were numerous times throughout his stay that Plaintiff did not have an interpreter or auxiliary device. Both Leah LNU from Vascular Surgery and Nurse Tiffany Reidling wrote notes to Plaintiff during his medical care. Plaintiff was discharged from Hillcrest on January 1, 2022 upon the recommendation of an infectious disease doctor.

36.    On January 14, 2022, Plaintiff was readmitted to Hillcrest for intravenous ("IV") medications for his ongoing infection. The treatment failed, requiring surgery on January 19, 2022.

37.    On January 19, 2022, on the day of the surgery, Plaintiff's treatment providers wrote notes to him instead of using an interpreter or auxiliary device.

38.    Plaintiff was inpatient at Hillcrest from January 14, 2022 through February 2, 2022 for treatment related to the infected foot and subsequent surgery. During the entire time, Plaintiff had problems accessing interpreters, sometimes during the day, but especially on second and third shifts. The Interpreting Coordinator, who was not on site, and staff did not use the VRI, which is not a viable option for Plaintiff. Plaintiff requested use of the Floor iPad, which listed Global Patient Services interpreters who were available and on

call 24/7. Instructions on accessing interpreters on the iPad were posted on the wall, as well as a sign that said, "I am Deaf, I do not hear. I speak for myself. I do not read lips. Use an interpreter." There were many episodes, especially during the evening shifts, by nurses and aides who did not adhere to the arrangements and did not know how to access the iPad. Ms. Cangelosi-Williams received telephone calls during late evening hours asking how to use the iPad or requesting her to interpret. Also during his hospitalization, when Plaintiff pressed the nurse's call button, someone would answer, "We'll be right there," despite knowing that Plaintiff is deaf. Ms. Cangelosi-Williams and Plaintiff's daughter would be in the room and hear the nurses' responses and inform Plaintiff. In addition, Plaintiff held on to the call button and felt the vibrations when the nurses spoke. When the staff would come in, they would not use the iPad. Ms. Cangelosi-Williams and the interpreters suggested and arranged for a sign to be put at the Nurse's Station that they should not answer via intercom or enter Plaintiff's room to interact verbally. Ms. Cangelosi-Williams also asked that a notice stating that Plaintiff is deaf be placed on his door. The request was denied, allegedly due to HIPAA regulations.

39. While staying inpatient at Hillcrest, Plaintiff was transferred via ambulance from Hillcrest to an appointment with the surgeon, Dr. Lyle, for a post-surgery follow-up appointment. The interpreter was not allowed to ride in the ambulance with Plaintiff.

40. Plaintiff's delay to Beachwood rehabilitation facility was delayed four (4) days due to lack of availability of interpreters, as well as a winter storm. In addition, according to the facility administrator, Beachwood's firewall and engineering problems made Plaintiff's use of the facility or personal iPad impossible. This occurred despite the fact that the liaison, Vanessa

LNU, confirmed Plaintiff's admittance with Beachwood by visiting the week before to confirm arrangements.

41.     On or about February 2, 2022, Plaintiff was to be transferred to a rehabilitation facility in Beachwood as confirmed previously by Hillcrest's liaison Vanessa LNU, who went to the facility to confirm admission. When Vanessa LNU negotiated arrangements, Plaintiff and Ms. Cangelosi-Williams requested the full-time interpreters from Global Patient Services or others contracted through the community agencies' lists from Sorenson Communications and Purple. Shortly before the transfer, Defendant CCF told Plaintiff and Ms. Cangelosi-Williams that the Beachwood location could not take Plaintiff as they were not equipped. The Chief Executive Officer ("CEO") of Beachwood said that the firewall was a problem and a big storm was coming so they could not accommodate Plaintiff. Prior to this directive, Ms. Cangelosi-Williams and Vanessa LNU, Hillcrest's liaison, were *en* route to Beachwood when Vanessa LNU was notified that the facility was not going to accept Plaintiff. Plaintiff did not leave Hillcrest on February 1, 2022 as previously scheduled. Lack of interpreters should not have been an issue, nor firewall problems. Beachwood had ample time to make arrangements.

42.     On or about February 1, 2022, Ms. Cangelosi-Williams spoke with the Case Manager from Hillcrest, Courtney Genovese, and Katie LNU, MSW, LISW, during which the VRI machine broke again in front of staff. The Euclid rehabilitation facility had been notified of Plaintiff's impending arrival for rehabilitation services.  The purpose of the conversation with Ms. Genovese was to protest the transfer to Euclid after approval for admission to Beachwood after being denied the opportunity to discuss the Beachwood rejection with the CEO of Beachwood.

9

43.     On  or  about  February  2,  2022,  Plaintiff  was  transferred  from  Hillcrest  to  Euclid  for rehabilitation services. The interpreter was not allowed in Defendant MMT's ambulance during the transport. Plaintiff was required to sign paperwork that he was not under the care of Defendant CCF while in the ambulance without an interpreter.

44.     Plaintiff was in the Euclid rehabilitation facility from February 2, 2022 to February 26, 2022.

45.     When Plaintiff arrived at the Euclid facility on or about February 2, 2022, he was met by the Nurse Manager, Renee LNU, who thanked Plaintiff and Ms. Cangelosi-Williams for bringing an interpreter. Renee LNU questioned whether the interpreter was related. Ms. Cangelosi-Williams  indicated  that  Euclid  had  been  notified  of  Plaintiff's  arrival  and insisted that the in-person interpreter be used and/or an iPad, but not the VRI.

46.     During Plaintiff's stay at Euclid, Plaintiff experienced inconsistent access to in-person interpreters, VRI issues despite Plaintiff and Ms. Cangelosi-Williams prior notification to Euclid  that  Plaintiff  wanted  in-person  interpreters  or  interpreters  on  the  iPad.  Ms. Cangelosi-Williams and Plaintiff's daughter had to interpret multiple times while Plaintiff was at Euclid.

47.     On or about February 3, 2022, Plaintiff had to use the VRI even though he previously told Euclid he wanted in-person interpreters or the iPad when Plaintiff was almost fainting due to low blood pressure.

48.     On or about February 4, 2022, staff took out and reinserted foley catheter without any communication.  No interpreter or auxiliary aid was used.

49.     On or about February 19, 2022, Joe Scaminace, Physician Assistant, tried twice to use the iPad when communicating with Plaintiff, but the technology failed. PA Scaminace entered

the room without announcing himself to Plaintiff while Plaintiff was sleeping, awakening and frightening Plaintiff. Plaintiff contacted Ms. Cangelosi-Williams the next morning to say how frightened he was. Ms. Cangelosi-Williams complained to supervisory nursing staff to investigate.

50.    On or about February 19, 2022 at approximately 8:30 p.m., Nurse Blanche LNU tried to talk with Plaintiff even though he is deaf. Nurse Blanche LNU did not know how to use the iPad. Ms. Cangelosi-Williams attempted to instruct Nurse Blanche LNU regarding the use of the iPad, to no avail. The interpreter on-call at Global Patient Services also tried to instruct Nurse Blanche LNU on the use of the iPad to no avail. Ms. Cangelosi-Williams called the on-call interpreter at Global Patient Services and she was unable to connect with other nursing staff at Euclid.

51.    Plaintiff met with Renee Ely, Nurse Manager at Euclid, on the day of discharge on or about February 26, 2022 and asked that he document everything that transpired during his stay. Mr. Ely agreed to do so.

52.    Beginning on or about February 26, 2022 and continuing to the present, Plaintiff has had issues with home care, especially regarding scheduling for home care appointments. The Physical Therapy scheduling system is set up so the therapists and nurses never know prior to the day before an appointment. This has created a myriad of episodes of scheduling difficulties related to the lack of in-person interpreters. Consequently, Ms. Cangelosi-Williams is forced to interpret just to address the urgent medical needs of Plaintiff.

53.    On April 19, 2022, Plaintiff went to Defendant CCF's emergency department at its main campus. Ms. Cangelosi-Williams called the emergency department prior to departing to advise them of Plaintiff's arrival in fifteen (15) minutes and to request that the emergency

department contact Global Patient Services to schedule an in-person interpreter or have the VRI up and running, at the very least. The person at the front desk said to just "come and wait." Ms. Cangelosi-Williams immediately called the Global Patient Services Coordinator, Glendia Boone, to inquire about interpreter availability. Ms. Boone informed Ms. Cangelosi-Williams that all of the interpreters were busy assisting other patients. When Plaintiff arrived at the emergency department, the VRI was used, only to have it malfunction. Another VRI unit was obtained and the appointment continued.

54. On or about May 16, 2022, there was no interpreter for a home visit for Plaintiff's catheter change. The nurse asked Plaintiff if he wanted to have an interpreter virtually, but Plaintiff declined as he would not be able to see what was being said on the screen while lying on the recliner couch for his catheter change.

55. Plaintiff had an appointment with Jefferson LNU from Home Care Services on or about Monday, March 28, 2022. Before Jefferson left, he checked the schedule and confirmed the appointment scheduled on or about Wednesday, March 30, 2022, would be at 12:30 p.m. with Pi Yau Yun, Supervisor, who would conduct an assessment, which is usually done every three to four weeks. The interpreter did not arrive at the scheduled appointment time of 12:30 p.m. Ms. Cangelosi-Williams contacted Ms. Boon, who told her that she received a request to start at 1:00 p.m., not 12:30 p.m. When the interpreter arrived, she indicated that she received a text message at 2:00 a.m. from the contract agency asking to come at 1:00 p.m., and then another text at 4:00 a.m. to confirm.

56. As Ms. Yun and other have explained, the interpreters' schedules are not set until the day before the appointment, and even then, the schedules are subject to change somewhat depending on how the previous appointment before Plaintiff's goes.

57.     On or about June 3, 2022, Plaintiff was admitted to Defendant CCF's main hospital. Ms. Cangelosi-Williams telephoned the emergency department and asked to have an in-person interpreter available when she and Plaintiff arrived. The Nurse Louise LNU and an EMT Technician met Plaintiff in the triage area. Louise LNU and the EMT Technician knew how to use the VRI. Bethany LNU, an interpreter from Global Patient Services, was called and arrived approximately one hour later to continue interpreting. Bethany LNU accompanied Plaintiff to his hospital room when he was admitted. By this time, it was approximately 11:30 p.m. Because it was so late, Bethany LNU was going to leave, but Nurse Luisa LNU set up the VRI to continue interpreting. After Bethany LNU left, the VRI disconnected. Luisa LNU attempted to obtain the floor iPad to interpret, but the iPad was locked up for the night and could not be used. Ms. Cangelosi-Williams finished interpreting for Plaintiff for the night.

58.     On June 5, 2022, Physical Therapist Matt Shultz was in Plaintiff's room when Ms. Cangelosi-Williams arrived at 10:00 a.m. The VRI was not working and there was no iPad. Mr. Shultz said he would document that the VRI was not working and that there was no iPad. A nurse finally brought an iPad into Plaintiff's room.

59.     During a June 6, 2022 discussion, plans were made for the transfer of Plaintiff from Defendant CCF's main hospital to one of Defendant CCF's rehabilitation inpatient facility. Plaintiff and Ms. Cangelosi-Williams asked the rehabilitation facility to provide in-person interpreters, not VRI. Initially, the request was denied.

60.     The physical therapist, occupational therapist, and in-house internal medicine doctor documented that they strongly recommended in-person ASL interpreting services. Plaintiff and Ms. Cangelosi-Williams also met with Case Manager Tony Oliverio, who contacted

the rehabilitation liaison, Tracy Orsic. Plaintiff and Ms. Cangelosi-Williams then met with Ms. Orsic.

61.　Plaintiff and Ms. Cangelosi-Williams explained why inpatient interpreters were the most effective and safe way for Plaintiff to engage in physical therapy and occupational therapy. Plaintiff and Ms. Cangelosi-Williams explained that Plaintiff is ninety-one (91) years old, has age-related macular degeneration, arthritis and a recent below-the-knee amputation. Plaintiff's posture is not conducive to watching a video relay interpreter on a small iPad attached to a pole or using a handheld iPad while in motion.

62.　Plaintiff and Ms. Cangelosi-Williams' request for in-person interpreters was initially denied by Ms. Orsic. Ms. Cangelosi-Williams then spoke with CEO Roger Richter about the necessity of having in-person interpreters citing the same reasons.

63.　Ms. Cangelosi-Williams asked Ms. Orsic to speak with the facility's legal counsel. After that, Ms. Orsic agreed to limited in-person interpreters from 10:00 a.m. to 2:30 p.m.

64.　Ms. Orsic informed Plaintiff and Ms. Cangelosi-Williams that she spoke with CEO Roger Richter and they were supposed to contact him with any questions.

65.　On or about June 7, 2022, Dr. Kamali, would not use an interpreter to communicate with Plaintiff. Instead, Dr. Kamali would only communicate in writing with Plaintiff.

66.　On or about June 9, 2022, Plaintiff was transferred from Defendant CCF's main campus to inpatient rehabilitation at Defendant Rehabilitation Hospital at Beachwood.

67.　During the first contact at Defendant Rehabilitation Hospital, Beachwood, by the aide did not know how to use VRI.

68.　During the day shift on or about June 10, 2022, Nutritionist Maria LNU did not know how to use the VRI so Ms. Cangelosi-Williams demonstrated how to use it.

69.    On or about June 10, 2022, Carolyn Dixon, Nurse Practitioner, Internal Medicine, from Internal Medicine conducted an evaluation of Plaintiff, but she did not use an interpreter. Instead, Ms. Dixon would only communicate in writing with Plaintiff.

70.    During the night shift on or about June 10, 2022, an aide, Pamela LNU and Nurse Steve LNU did not know how to use the VRI. After Ms. Cangelosi-Williams showed them how to use the VRI, there was no ASL interpreter. Plaintiff had to wait for the VRI service to return the call.

71.    On or about June 14, 2022, Ms. Dixon from Internal Medicine did not use an interpreter. Instead, Ms. Dixon only communicated in writing with Plaintiff.

72.    On or about June 19, 2022, the doctor tried to use VRI, but there was no connection.

73.    On or about June 20, 2022, Nurse Kelly LNU entered Plaintiff's room with a mask on and began talking to Plaintiff. Ms. Cangelosi-Williams asked Kelly LNU if she knew how to use the VRI, which was next to Plaintiff's bed. Kelly LNU said she heard something about the VRI that morning, but Kelly LNU continued to verbally speak with Plaintiff to communicate. Ms. Cangelosi-Williams told Kelly LNU that Plaintiff did not understand one word she said and referred Kelly LNU to the sign above Plaintiff's head indicating that Plaintiff did not read lips and to use an interpreter. Next, Kelly LNU approached Plaintiff, took off her mask and continued to speak with Plaintiff.

74.    On or about June 22, 2022, Dr Ashraf, Internal Medicine, who had been instructed by the Nursing Supervisor to use interpreting services for Plaintiff, did not use interpreters. First, Dr. Ashraf verbally spoke with Plaintiff. Next, even after being told to use interpreting services by Emily LNU, Supervisor, again, he tried to sign two (2) words, "pain" and "cold." The signs were not complete sentences and not grammatically correct so the

meaning was not conveyed. The third time, Dr. Ashraf simply walked into Plaintiff's room and threw a card on Plaintiff's tray table and left. The card was Dr. Ashraf's business card, which also had Ms. Dixon's name on it.

75. During or about the last week of June, 2022, a nurse from Human Resources came in Plaintiff's room to conduct a survey. Ms. Cangelosi-Williams asked to use an interpreter. No interpreter was scheduled for that day even though Plaintiff was being discharged the next day. In order to facilitate the discharge, Ms. Cangelosi-Williams was required to interpret for Plaintiff.

76. On or about July 9, 2022, Plaintiff went to Defendant CCF's main campus emergency department at approximately 3:00 a.m. VRI was secured beginning with triage, but once the VRI was connected, Plaintiff was informed there were no interpreters available. Tiffany LNU, Triage Nurse, attempted several times to get an interpreter on screen without success. In the examining room, this continued to happen for approximately one hour when Defendant CCF's staff interpreter, Shellie Henskey, showed up. If an iPad had been available, the staff interpreter could have interpreted from home, instead of driving forty-five (45) minutes into the emergency department. The interpreter explained that had an iPad been available, it could have been used to the Nurse Manager, Alex LNU. The discharge summary did not reflect the problems Plaintiff had with the VRI and lack of an iPad as Ms. Cangelosi-Williams requested to be documented.

77. On or about July 16, 2022, Plaintiff had x-rays taken at the radiology department. The staff person in radiology was unfamiliar with the VRI unit. Ms. Cangelosi-Williams had to tell the front desk person that she and Plaintiff brought it from the lab. Upon meeting Plaintiff, the technician said that he did not need an interpreter because she was just going to take

three simple pictures. The technician was also unfamiliar with the VRI machine, and Ms. Cangelosi-Williams insisted she use it and provided her with instructions to do so. The circumstances again required that Ms. Cangelosi-Williams interpret for Plaintiff so that he could understand the medical treatment.

78. On or about October 7, 2022, Ms. Cangelosi-Williams contacted the scheduling department for Defendant CCF's radiology department at the Risman Center at approximately 1:00 p.m. and secured a 2:30 p.m. appointment for Plaintiff. After several attempts, Ms. Cangelosi-Williams was able to speak with someone at the front desk of the radiology department to request the VRI machine be available and ready when she and Plaintiff arrived. Plaintiff and Ms. Cangelosi-Williams were willing to use a VRI instead of an in-person interpreter given the short turnaround for the appointment. The representative assured Ms. Cangelosi-Williams that he knew where the VRI was located and would have it ready. Ms. Cangelosi-Williams asked the front desk person where it was located since she and Plaintiff encountered a problem with the VRI the last time they were in that department. The representative refused to provide an answer.

79. When Plaintiff and Ms. Cangelosi-Williams arrived, there were two female representatives and one male representative at the desk. Ms. Cangelosi-Williams asked if the VRI unit was there. No one seemed to even know what the VRI was. By that time, the technician arrived in the waiting room and called for Plaintiff. The technician and her coworker were not informed of the need for the VRI and did not know how to use it. Ms. Cangelosi-Williams explained what was needed in the presence of the three representatives who were seated at the desk. One of the female receptionists said she knew where it was and could show her how.

80.  When Plaintiff and Ms. Cangelosi-Williams entered the radiology room, the interpreter did not appear on the VRI machine. Given the circumstances, Ms. Cangelosi-Williams was again required to interpret for Plaintiff.

## COUNT I: Violations of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182

81.  Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

82.  Plaintiff, who is profoundly deaf, has a disability as defined by the ADA.

83.  Defendants are places of public accommodation covered by Title III of the ADA.

84.  Defendants repeatedly received notice that Plaintiff is deaf and needed an accommodation.

85.  Defendants discriminated against Plaintiff by refusing his full and equal enjoyment of their goods, services, facilities, privileges, advantages, or accommodations because he is deaf. Plaintiff has been denied the same opportunities that are readily available to hearing persons to receive information, ask questions, and make informed medical treatment decisions.

86.  Plaintiff needed a qualified ASL interpreter to ensure that Defendants did not deny him services or otherwise treat him differently than other individuals because of his disability.

87.  At all times relevant hereto, Defendants had an ongoing obligation to furnish auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities and their companions.

88.  On numerous of Plaintiff's visits at Defendants' facilities, Defendants failed to provide him with an ASL interpreter or any other auxiliary aid or service to ensure effective communication with Plaintiff and Ms. Cangelosi-Williams during Plaintiff's medical treatment

89. With their resources, Defendants are able provide patients and companions who are deaf or have hearing loss with qualified in-person interpreters without taking on an undue burden.

90. Plaintiff continues to receive medical care from Defendants, and he intends to remain a patient of Defendants to maintain continuity of care. Failing to provide Plaintiff an interpreter at future appointments will create a likelihood that he will suffer a substantial and irreparable injury.

91. Based on Defendants' record of repeatedly denying Plaintiff interpretation services that would ensure effective meaningful communication for Plaintiff to understand and make proper medical decisions for himself, it is reasonably foreseeable that Defendants will continue their failure to provide an ASL interpreter for Plaintiff's future appointments.

**COUNT II: Violation of Section 504 of the Rehabilitation Act,**
**29 U.S.C. § 794**

92. Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

93. Defendants are principally engaged in the business of providing health care.

94. At all relevant times, Defendants have received federal financial assistance and is, thus, subject to Section 504 of the Rehabilitation Act.

95. Plaintiff, who is profoundly deaf, has a disability as defined by the Rehabilitation Act.

96. Disability aside, Plaintiff was, and is, otherwise qualified to receive health care services from Defendants.

97. Because of Plaintiff's disability, Defendants denied him benefits of its health care services. The services Defendants provided to Plaintiff were not the same or substantially similar as the services it provides to hearing individuals.

19

98.     Defendants did not provide Plaintiff with the auxiliary aids necessary to afford him an equal opportunity to benefit from Defendants' health care services.

99.     Defendants acted with deliberate indifference in denying Plaintiff the full benefit of their services.

100.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer economic and noneconomic damages for which Defendants are liable, including but not limited to pain and suffering, emotional distress, mental anguish, and expenses incurred for his medical care and attention.

<u>**COUNT III: Violations of Revised Code Chapter 4112,**</u>
**R.C. 4112.02(G)**

101.    Plaintiff reincorporates, as if fully realleged herein, the foregoing paragraphs of the Complaint.

102.    Plaintiff, who is profoundly deaf, has a disability as defined by R.C. Chapter 4112.

103.    Defendants are places of public accommodation covered by R.C. Chapter 4112.

104.    Defendants repeatedly received notice that Plaintiff is deaf.

105.    Defendants discriminated against Plaintiff by refusing his full and equal enjoyment of their goods, services, facilities, privileges, advantages, or accommodations because he is deaf. Plaintiff has been denied the same opportunities that are readily available to hearing persons to receive information, ask questions, and make informed medical treatment decisions.

106.    Plaintiff needed a qualified ASL interpreter to ensure that he understood the medical diagnosis and treatment at the time.  Defendants denied him services or otherwise treat him differently than other individuals because of his disability.

107. Defendants have an ongoing obligation to furnish auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities and their companions.

108. On numerous of Plaintiff's visits at Defendants' facilities, Defendants failed to provide him with an ASL interpreter or any other auxiliary aid or service to ensure effective communication with Plaintiff and Ms. Cangelosi-Williams.

109. With their resources, Defendants can provide patients and companions who are deaf or have hearing loss with qualified in-person interpreters without taking on an undue burden.

110. Plaintiff continues to receive medical care from Defendants, and he intends to remain a patient of Defendants to ensure continuity of care. Failing to provide Plaintiff an interpreter at future appointments will cause Plaintiff to suffer a substantial and irreparable injury.

111. Based on Defendants' record of repeatedly denying Plaintiff interpretation services that would ensure effective communication, it is reasonably foreseeable that Defendants will continue their failure to provide an ASL interpreter for Plaintiff's future appointments.

## PRAYER FOR RELIEF

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

a. Declare that Defendants' acts and conduct constitute violations of federal and state law;

b. Order Defendants to develop, implement, and comply with a policy prohibiting future failures to provide appropriate auxiliary aids and services, including qualified ASL interpreters, free of charge to individuals who are deaf or have hearing loss, where necessary to ensure effective communication;

21

c.  Order Defendants to develop, implement, and comply with a policy requiring that when individuals who are deaf or have hearing loss request an onsite interpreter, one will be provided as soon as practicable in all services offered by Defendants;

d.  Order Defendants to contractually require all ASL interpreters at its facilities to adhere to the Code of Professional Conduct jointly developed by the National Association of the Deaf and the Registry of Interpreters for the Deaf, Inc.;

e.  Order Defendants to ensure that least one qualified ASL interpreter is available at all times for a patient who is deaf or has hearing loss and whose primary means of communication is ASL;

f.  Order Defendants to continually evaluate and review the performance of all ASL interpreters at its facilities to ensure that all interpreters used by Defendants are qualified;

g.  Order Defendants to develop, implement, and comply with a policy to ensure that Defendants will notify individuals who are deaf or have hearing loss of their right to effective communication, including conspicuously posting and maintaining the following notice in the lobbies of its facilities and wherever a Patients' Bill of Rights is required by law to be posted:

"In compliance with the Americans with Disabilities Act, qualified interpreters and other auxiliary aids and services are available free of charge to people who are deaf or have hearing loss."

h.  Order Defendants with regard to Video Remote Interpreting ("VRI"):

i.  to develop, implement, and comply with a policy ensuring that deaf or hard-of-hearing patients are able to communicate through an in-person interpreter whenever possible;

ii.     to develop, implement, and comply with a policy to ensure that VRI, when used, has a high-speed Internet connection; a video screen with appropriate size, position, capture angle, focus, and proximity to the patient; and appropriate audio quality. The policy should require that the VRI equipment be portable so it can be moved to a patient's location, preferably in a private room to minimize distractions and maintain confidentiality;

iii.    to regularly train its employees, staff, and other agents about Defendants' VRI policies, including training on how to set up VRI systems and how to obtain technical assistance when a system malfunctions;

iv.     to provide proper and regular maintenance on all VRI equipment and documented in a maintenance log;

i.    Order Defendants to create and maintain a log of each request for an auxiliary aid or service;

j.    Order Defendants to annual Americans with Disabilities Act training regarding proper and lawful communications with Deaf and Hard of Hearing patients during medical care to its employees and other staff addressing the following:

i.     the degrees of hearing impairment;

ii.    the required charting procedures governing requests for auxiliary aids and services;

iii.   types of auxiliary aids and services available at Defendants;

iv.    proper use and role of qualified interpreters; and

v.     procedures for scheduling a qualified ASL interpreter as quickly as practicable when necessary;

vi.      proper maintenance of VRI equipment;

k.      Enter judgment in Plaintiff's favor for all claims for relief;

l.      Award Plaintiff full compensatory damages, economic and noneconomic, including but not limited to damages for pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that Plaintiff has suffered and is reasonably certain to suffer in the future;

m.      Award pre-judgment and post-judgment interest at the highest lawful rate;

n.      Award Plaintiff reasonable attorneys' fees and all other costs of this lawsuit, including expert fees;

o.      Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

Respectfully Submitted,

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
**THE KNOLL LAW FIRM, LLC**
7240 Muirfield Drive, Suite 120
Dublin, Ohio 43017
Telephone: (614) 372-8890
Facsimile: (614) 452-4850
Email: lknoll@knolllaw.com
*Trial Attorney for Plaintiff Charles Williams*

## JURY DEMAND

Plaintiff requests a trial by a jury on all issues set forth herein.

*s/Laren E. Knoll*
Laren E. Knoll (0070594)
The Knoll Law Firm, LLC
*Trial Attorney for Plaintiff Charles Williams*

24